Good morning, I'm Nicholas DeSato and I represent the Defendants' Appeal. I plan to reserve five minutes for rebuttal. The District Court concluded that one case, L.W. v. Grubbs, unquestionably put all corrections officers on notice that sending corrections employees into situations where they would encounter violent inmates and be exposed to an inmate assault violates the 14th Amendment. From that broad general proposition, the District Court denied qualified immunity and authorized constitutional liability against 16 A.D.C. corrections officers for their alleged roles, each of them distinct, in eight different instances involving an inmate assault on a fellow officer. The District Court's error was twofold. First, it defined and applied the constitutional right at too high a level of generality. Simply stating that a corrections officer violates the 14th Amendment when he sends another employee into harm's way just restates the state-created danger doctrine. A legal principle is clearly established only if it clearly prohibits the officer's conduct in the particular circumstances before him. There's absolutely no specificity in the District Court's formulated principle. Second, the broad general proposition it relied upon cannot be extrapolated from Grubbs' facts or its holding. There were two allegations in Grubbs that elevated the claim to a viable 14th Amendment claim. First, the defendants in that case tricked the plaintiff nurse into actually working in the facility by misleading her into thinking that she would never have to work alone with violent sex offenders. And two, the defendants then, after hiring her on that misrepresentation, assigned a violent sex offender whom they knew was very likely to assault a female if left alone, and then assigned the sexual predator to work alone with the plaintiff. None of the plaintiffs in this case have even remotely similar allegations. None allege that they were tricked into accepting their jobs or that on the day of their respective assaults, they protested the unit they were assigned to or the task that they were assigned. In fact, most all of them allege that they were aware of the understaffing, the alleged understaffing, the alleged malfunctioning cell doors, the security policies or classification policies. None allege that the defendants ---- On count one, the Russett thing, are you saying that Russett was aware that there had been an overriding of the security classification for Hilton? It's unclear. It's not alleged whether he was aware of it at any time as far as the overriding. Isn't that ---- Okay. We're talking about people who know what their job is, that they're dealing with people who are imprisoned, that the locks don't work, and that things are understaffed. But if there was an override of the security for Hilton, isn't that an affirmative act that they should have been informed of, that Russett should have been informed of? Is it an affirmative act? Overriding a classification is, by definition, an affirmative act. Did the two defendants in that count make that affirmative act? According to the allegations, no. It was Defendants Curtis and Smith who overrode the classification. The allegation ---- It was not Fitzer and Morris. The allegation is that Fitzer and Morris refused to reclassify. Now, there is, and this is what the district court relied on, a subsequent conclusory allegation at the end where they lump all four defendants together and say, Fizer, Morris, Curtis, and Smith overrode the classification. So I think there's a fault in the premise of your question as to whether these defendants actually committed that affirmative act. But assuming that they did, is that an affirmative act? Yes. But that's only part of the element. The question is, did that affirmative conduct place Russett in a ---- or expose Russett to a danger that he otherwise would not have faced? And that danger has to be actual, particularized, and specific to him. As to Russett. That's correct. And overriding one of hundreds, if not thousands, of classifications on a daily, weekly, or monthly basis isn't specific to ---- doesn't pose a specific threat to any particular employee that steps foot in that facility. That's something that happens on a day-to-day basis. So we can pick apart what the affirmative acts are and, in short, assigning an employee to go work in that unit or to go get that inmate. Those, by definition, are affirmative acts. I'll point out that those are only alleged in a handful of these allegations. Counts, for example, Counts 5, 8, and 9. There's no allegation that the defendants in those cases against Baca, Acosta, and Asuna were ordered by any of the named defendants to work in the facilities or to actually retrieve or return the inmates to the cell. So if we're looking at affirmative conduct and we have to tie it to a specific defendant, then we have to ask ourselves, did it expose them to a danger that they would have otherwise faced, and was that danger actual, particularized, foreseeable, and specific to that defendant? Well, what about Knight and Count 3, then? Isn't that so? Is it Lunkin, Hibbard knew that Braxton had been labeled psycho, he was violent, he just recently lost his job, and he'd been behaving erratically and aggressively? Sure. Again, that allegation is that the two defendants, Lunkin and Hibbard, that they reassigned Knighton to be a yard set officer. She alleges that she had never done that before. So she goes from one unit to the next and performs that task. So that is an affirmative act by definition. But did it expose her to the risk of, I believe this was inmate Braxton? Well, there are allegations that he has previously acted out, but there's no temporal proximity to this assault. There's nothing that says that he made a specific threat against Knighton. More importantly, there's no allegation. So when you say it has to be particularized and specific, that it has to be directed at this particular officer rather than I'm going to get the next officer I see? Well, now, that's count too, and I think that's a closer call. Okay. But let's just get back to Knighton first. You're saying that you have to specifically point out the particular corrections officer that may be at risk. Sure. There has to be a particularized danger to that officer for some reason above and beyond any of the other officers. So Braxton, in order to qualify under your theory with Braxton, well, Braxton would have to have said, I'm going to get Knighton. That would, if the defendant Well, but you're saying that it has to rise to that level. In this context, yes, because prisons are inherently dangerous. Inmates in facilities act out. They randomly act out for whatever reason. And it's – it could be specific to a specific officer or just generally. Now, I actually believe in this count there was an allegation that he had threatened to take out a CO. Yes. In that particular allegation. Now, again, that's closer than a general threat. I mean, it is a direct threat. But it's still not enough, according to your theory. That's right. I don't believe it's enough. But there's the other part of the equation here, and this goes to the deliberate indifference, because we can have this discussion about whether it's enough. But with this allegation in particular, and actually with all of the claims, there's no allegation that the defendants, in that case, Hibbert or Luca, knew that this inmate, that Braxton was going to assault her or that he posed a danger to her. And when you look at Grubbs 2, that case says they have to know that something is going to happen, and that they intended to execute to expose her to that risk. All they did was reassign, according to the allegations, because of understaffing, reassign one officer in one unit to another unit. There's lots of inmates in the unit in buildings and pods, and those inmates, undeniably, have made threats or are dangerous or pose risks at varying levels. There are different classifications. But that cannot be enough to rise to the level of deliberate indifference or exposing an employee in this corrections facility to a danger that they otherwise would not have been exposed to. Otherwise, taken to its logical end, simply hiring a corrections officer could satisfy this test, or scheduling them to work in any unit. Because at any given time, something could happen. They're inherently dangerous. Prisons are inherently dangerous. It's got to be something more. It's got to be something more than they were, this happened six months ago or the day before. Did I misunderstand, then, the second-minted complaint, and that is, in the Knighton circumstance, that it was alleged that the two defendants, Luka and Hibbard, knew that Braxton was violent, that he had recently lost his job, that he had recently been behaving aggressively and erratically, had recently been tested for meth, positively for meth, and recently threatened to take out a C.E.O. Did I misunderstand? No. You're right, Your Honor. They, they alleged. And, and, and that, they have that knowledge, at least it's alleged they did, and to send, put Knighton into this new setting, the yard set, without any warning of that is not deliberately indifferent? I don't believe so. Again, there's no allegation as to the temporal proximity of these events. I thought we just said that, that the allegations in the second-minted complaint were that he had recently lost his job, had recently been behaving. And we don't know if that was a week before, a month before, I mean, that's a, that, that, I don't know what that means. It's not defined. And maybe that would factor into this, if it were the hour before, or the, or within 15 minutes before, like in the, in count two, like in Holder, maybe that's a closer call. It sounds like, like the type of information you would develop during discovery, rather than something that you should have such precise knowledge of when you're, you know, doing an amended complaint to satisfy the concerns of the, the, the judge in looking at the first complaint. Well, I mean, they've got to satisfy Rule 8 to even get to that stage. I mean, this is a 400-plus paragraph complaint. They, they had a lot of information to, to prepare this complaint. And those aren't allegations that, that need a lot, I mean, you either know it or you don't. But, but I want, but even assuming that these recent, these, these known facts about Braxton were more recent in time to the assault. There was nothing specific to, to Officer Knighton or, you know, they didn't even know that, there's no allegation that they knew that Braxton would be walking around the facility. Well, can, can you, so you're telling me that when Bratton says recently that, that, that he makes a threat to take out a CO, is that, that is something that, that a CO ought to always assume, that every prisoner that, that you encounter is going to take you out, is going to try to take you out. Is that what they're supposed to be thinking? Sure. Sure, it's a dangerous job. Yes. So what you're saying is that unless, unless a prisoner says, I am going to take out Knighton, is it that a general threat contemporaneous with Knighton going in there, towards COs is not enough for particularization? I think that specific threat is enough. I think there's some gray before that. I, I do. I think that there's some gray if it's, I'm going to take out the next CO. You know, that, that's arguably enough because it's close in time and, and then you have knowledge that you're about to send a CO into that situation. With Knighton, there's no, there's no allegation that these defendants knew whether Braxton would even come into contact with, close contact with, with Knighton, whether he would be selled or whether he'd be walking around. Her job was to, to conduct welfare checks. Go by the cells, make sure that they're alive. This happened outside of a cell. There's no allegation how he got out. Whether he is, whether, there's just, there's. I assume it's a yard. The yard set means that they're out in the yard. Well, that's not defined, that's not defined or alleged in the complaint. But if she's doing welfare checks, that's typically when you're looking in cell windows, making sure that they're, that they're alive. And then the second part of the job was to pull specific inmates that needed to go to medical. Now, this assault happened between those two jobs, so it didn't even happen when, when she was performing the welfare checks. She had completed the welfare truck, welfare checks, and, and then, and then it was in a lull between then going back and actually pulling out inmates. I don't want to consume all your time on this, but go ahead. Counsel, just out of curiosity, were there any workers' compensation claims filed as a result of these injuries? That's not in the complaint, but, yeah, that's not, that's outside of the complaint. Because to me, that would seem to be the logical place where these complaints would be resolved. Yep. That's, that's why we have workers' compensation. And we also have State law torts. The Fourteenth Amendment is not a panacea for all wrongs. There are other available remedies. Let me ask, if you, let's just assume for a moment that one of these counts, they can state a claim. You, you argued for qualified immunity. Did you want to address that? Sure. I want to save some time for rebuttal, but I'll be quick. I'll give you time for rebuttal. Okay. Yeah, right. So qualified immunity, again, you go back to, to Judge Silver's orders. It was based on one case. That was the Grubbs case. And that case, that case can only clearly establish the law if it put every reasonable official on notice that what they were doing in, in these eight instances put them on notice that, that what they did clearly violated the Fourteenth Amendment. That necessarily requires you to look at the facts in Grubbs and compare them to the facts of these, compare them to these allegations. I'm not saying we need a case that's identical or even materially similar. And I know courts like to cite Hope v. Pelzer and, and the Flores case, which were issued in 2002 and 2003. But if you look at the more recent cases in the last five years, the Supreme Court and even this court in the most recent state created danger claim, Hernandez v. City of San Jose, says you need to find a case that put the defendant on notice that, that these defendants in this case under these particular circumstances violated the Fourteenth Amendment. And when you look at Grubbs, it simply didn't do that for all 16 defendants in each of the eight different instances. Grubbs didn't involve cell door locks or understaffing or, or security policies. Grubbs was very specific. And I might add, it was the second case to come out by this court that even acknowledged the state created danger doctrine before the elements were, were fully developed over the next 20 years or so. I'd like to reserve whatever time you give me. Judge Murphy has a question. Sure. But essentially, when you get right down to it, what you're saying is that the clearly established law does not exist because these folks were corrections officers. Grubbs was not a corrections officer, a nurse, a regular employee. Isn't that the essential basis for your claim? That's, that's one of about 12 distinctions. She was a nurse. These are trained COs. No, but isn't, isn't that, isn't the guts of your position is we've never had a case that, that talked about corrections officers. No, because that's not a true statement. We have Grubbs, but. Well, Grubbs is, isn't Grubbs different than a corrections officer? An inmate on staff assault in a corrections facility to be, you're right, it didn't involve a corrections officer. That, that's one distinction. But, but really the guts of Grubbs is a misrepresentation when, when you hired the employee, an affirmative misrepresentation. And two, after they hired her, they went out and hand selected the, the, the, a sexual predator whom they said she would never have to work with. And, and thrust him upon her effectively. Outside of those circumstances, there's nothing that clearly established any of these claims.  I'll, I'll, we'll put two minutes on the clock for rebuttal. Thank you. Good afternoon. May it please the court. My name is Scott Zwillinger and I'm here on behalf of Christopher Russett and seven other similarly situated correction officers. What, with the court's permission, what I'd like to make sure we're all aware of is the context that we're here. This is not a motion to dismiss. As the bench correctly pointed out, we haven't even gotten to discovery. Have not. There's so much information we don't know. Who made specifically what decisions? What the staffing was that day? What options were available? No depositions. Specifically, what were people told and who knew what? We understand that. But, but, but, you know, we have to get to the bottom of it because that's what qualified immunity is all about is to avoid all the expenses that you've just laid out. Absolutely agree. But that standard also requires that when we, we, we did do significant investigation, the extent we could, we laid out a very detailed first amendment complaint and second amendment complaint. But then the standard requires that not only all the allegations be accepted as true, of course, but that the facts that every inference from those facts be taken as true. Let me tell you one of the problems I'm having is that if you read the district court's opinion, is that the district court says you accept this as it is. It's a prison. They have faulty locks and they're understaffed. And yet when, in many of these counts where the district court goes through them, it seems to say, well, you know, they were understaffed. And it counted that against the defendants, that they were understaffed and the locks didn't work, rather than accepting that as the status quo. I mean, that's what they're working with. Everybody knows the locks didn't work and everybody knows they're understaffed. So that is not factored in, is it? Well, I think that there's the first part about that, that they're understaffed. I would gather to guess that almost every prison believes it's understaffed, but that the locks don't work in prison is a remarkable event. It's not simply, respectfully, the status quo, you know. But as well, as I understand it, is that there's nothing to indicate that the corrections officers all didn't know, basically, you couldn't depend on the locks in any of the facility. Isn't that true? That is true. That they knew that they — sometimes they work, sometimes they don't, sometimes they were monkey with, sometimes they were. But the — so I just want to — it's a remarkable fact. But that — But does it rise to the level of a constitutional violation? That's the difficulty I'm having, is making workplace issues rise to the level of a constitutional violation. Two things about that. First off, the decisions that were made by the defendants were based on this remarkable fact that locks don't work. So they're making decisions about putting people in places where they're — where they are almost surely to be injured with violent inmates, inmates who have made threats, making those decisions with that knowledge of an absurd fact. But — But if they don't go in to do their job, then the inmates are not policed at all. So — That assumes that — I'm sorry to interrupt you. Go ahead. Go ahead. That assumes that there are no other options. And when we talk in the complaint, we talk about closed units, open unit, pulling inmates who make specific threats into administrative segregation. There are other choices. Now, I can't sit here and tell you every choice because, again, I haven't had the opportunity to conduct discovery. But those are discretionary decisions that have to be made weighing the security needs of the prison, the budgetary concerns, staffing patterns. All of those have to be taken into consideration. And that's not something that we, as judges, should be trying to weigh, should we? Well, that assumes, as the motion is misstaged, that there are no other options that would have satisfied all of those concerns, that I can't — and we will produce expert witnesses if we're lucky enough to get to — through discovery that will say that there were plainly other options that would have addressed those issues, whether they could afford to fix locks or not, that there would have been things that they could have done that would not have simply put them in danger. And what occurred was just a callous disregard for the inmates — excuse me, for the officer's safety and to put them in places where they knew that they were exposed to danger. Is Grubbs your best case to support the proposition that this was clearly established law that the defendant should have followed? Absolutely, Grubbs is our best case. But aren't there some differences in Grubbs that keep it from being the ideal case to support your client's position? Well, obviously, I would love to have a case with correction officers in the same situations, but that's not what — Well, do you have one with corrections officers? Let's start with that. No, Your Honor, I do not. But what I — Isn't that a significant difference? It's not a significant difference, because that assumes that these — this was the other, well, the context part that I wanted to remind the Court of, is that this is different than, for example, the Supreme Court cases dealing with the sewer worker who goes into the sewer. This is a controlled environment. These officers are not free to protect themselves. These officers are not free to bring in tasers or unauthorized weapons. They are reliant on their — on what they're given. They're reliant on the rules that are set by their supervisors because they cannot simply protect themselves. And when we look at Grubbs — But they're free to do this job or not do this job. They're not required to have this job. So they're free — corrections officers are trained to do this specific job that they're doing. And if they view themselves as being placed in unnecessary danger, they're free to leave the job. Some of my officers were baby officers. Knighton, for example, was recently out of the academy. I believe Holder was recently out of the — Holder was recently out of the academy. And she had no way to know. She had never been a yard set officer. And, you know, I know what a yard set officer is from other cases I have. It's a job that involves a numerous amount of tasks. It's not given to baby officers. If we get to discovery, we'll demonstrate that. And so, yes, I suppose they were free to take other positions if it was available to them, but that presumes that they had the experience and the knowledge going forward to be able to say, hey, this isn't safe. I quit. I'm not coming to work today. And respectfully, that's not what required. They relied on the policies. They relied on their training. They relied on knowledge and sharing information and their supervisors. And they put them in these situations. And talking about Grubbs, the counsel for the State misstates a little bit about Grubbs, and that's this concept that she was misled, that the nurse was misled about what was going to happen. Now, if we look at Grubbs, sure, it is true that it talks about that she was never specifically told that she would come in contact with violent inmates. But when this Court in the 1992 opinion went through the five factors, that factor was last. And the Court said, would not be prepared to defend against or take steps to avert an attack because she had not been informed at hiring that she would be left alone with violent offenders. Well, I don't think anyone would reasonably argue that a nurse should be prepared to confront inmates. Generally, if there's someone who's not a corrections employee, a trained, you know, a trained corrections officer, they have a corrections officer there with them for  Generally, there's someone who's expected to give security, and the untrained people give the — provide the services. That's what's different to me in Grubbs. Right. And I — it's not true in Arizona, but it's not a point. But the difference here is that if you look at the specific complaints, and let's — maybe if I — if I may, if I could talk about some of them. When Desiree Knighton is set out in the yard, and there's a specific threat by this for using, I believe, methamphetamine, had his cush job with Swift Transportation ripped away from him and said, I'm going to get the next officer I can, and she's put in position of coming in contact with that person, not told, and the decision is made by the defendants not to remove him from general population and put him in admin segregation, that's not a condition that she signed up for. That's not a condition that any correction officer signed up for. Now, I have to prove that ultimately to a jury, because I have to prove deliberate indifference. I have to prove that they had knowledge of the risk, and they didn't — and they disregarded the risk. But I have — but I should be provided the opportunity to do that after discovery, because, again, we're just at the motion-to-dismiss stage. The same is true of Christopher Russett, or when he's not told about an inmate who is making threats, or Mr. Holder, when that inmate makes a specific threat and is not removed. Those are decisions that are made that we believe will — will prove that they violate policy, that when an inmate makes a threat against an officer or staff or anyone, they are to be removed for the obvious reason that when they make a threat, they probably mean it and someone's in danger. And so those are affirmative acts that are far above and beyond what correction officers sign up for. You focused on particular counts. What about a count like Baca? Is there anything more there than an allegation that the locks were faulty and that there was understaffing? Well, it's also the decision to have an open unit when you don't have staffing and you have broken locks. The difference, again, between an open and a closed unit is, you know, open, the inmates are able to roam around. In this case, they're able to pop their cell locks occasionally and move around, but it just — But we know that because we know the locks don't work. Right. And then you make — and that's my point, Your Honor. Then you make the decision to not close the unit, not make them have segregated movements so that the officers are protected, and that — By open movement, you mean they're not restrained when they leave the cell. Correct. Well, what does that matter if the cell lock doesn't work? Well — I mean, you can't have them restrained while they're in the cell, right? No, you can't. Okay. But you also have more than one officer there as well with them. And, yes, if they're in the cell and they're able to get out, but the officer doesn't know that they're coming out at that point. So if they're all able to have restricted movement, there may be safety. They made a decision. And these supervisors didn't have to make that decision to allow them to have open movement in the unit. And if I may also talk about Defendant Kohler — excuse me. Is that an affirmative act, or is that a failure to act? Well, that's the thing, right? I mean, every — if I choose not to take an action, I suppose it could be painted as not an affirmative act. But when I act, I have knowledge and I have options, and I choose an open unit over a closed unit, that's an affirmative act. And the standard, if we look at the law, it talks about placing the — increasing the danger, correct? So we acknowledge that these are correction officers that work in a prison that has dangerous people. But in each one of — And you have to add to that. It has dangerous people. Yes. The facilities are not maintained, the locks, and they're understaffed. You have to add that in, don't you? Absolutely. And then you make decisions with those — those — but again, those are absurd pieces, but put that aside. You make decisions, putting people in places, people — putting people in positions. We talk about in the complaint, it talks about collapsing down positions. So now instead of having two floor officers, you have one. Instead of having four-yard set officers, you have two-yard set officers. Those are all affirmative decisions, affirmative acts that are based on the knowledge that your prison is incredibly understaffed and that your locks don't work in prison. So, yes, those — that crosses the line of a — So does that mean that just if any time in those circumstances that you just laid out there, that somebody is beaten up by a prisoner, that they've got a — that provides a basis for a constitutional claim under 1983? No. I'm not suggesting that every single officer who gets injured has a claim. I'm suggesting that when there are acts and decisions, because it goes back to the knowledge element, right? I have to be able to prove deliberate indifference. I have to be able to prove that each particular defendant had knowledge and made decisions based on that knowledge. There are certainly going to be random acts of violence in prisons, probably — maybe probably many more than what we're at issue here, where the supervisor or the chief or some other officer doesn't have that knowledge and it's a random act. That's not a claim that we — that would be part of this type of claim. So it seems to me if you go from two — well, I don't know. I don't know anything about how prisons are managed, but you just alluded to collapsing from two — two guards to one, two COs to one, which apparently could create a dangerous situation. Absolutely. Right? Right. But just because there are these dangerous situations, and even — I mean, even though Arizona's prisons are run in this manner, and even though it happens all the time, that shouldn't excuse these defendant actions as to these plaintiffs. These folks were put in these situations. Their lives, you know, they made decisions based on — on going to work that day based on what they knew and what they experienced, not expecting to be put back into these situations. They're going to work, then. It's a dangerous place to work. Absolutely. Right? But it's — it's a dangerous point where there's controls and protections and backups. That's what they expect. They expect that if they go to a unit and it's represented, there's going to be four officers or two officers on a floor, you know, the buddy system to — to protect each other, that that's what's going to happen. They expect that when they go there, an inmate makes a specific threat to hurt an officer, and that in — and the policy requires that inmate to be pulled into admin sec so he can't get near officers, that that's going to happen. And so that's what this suit is about. It's talking about there's this underlying level of danger, but these are all acts that were, by the defendants, that created more danger above the danger these folks went to work every day with. How do you set the floor for danger? How do you set — Yeah. Well, that you — Well, you have a prison that locks their work, and you have sufficient staffing, and you have policies, and you expect the supervisors to follow their policies. So if — if, for example, one of my officers had been injured, and the policies had been followed, and the prison was sufficiently staffed, and the locks worked, that's the floor. That's not a constitutional claim. That's a claim perhaps under State law, perhaps under workers' compensation, but we're — the floor's not here. This — what we're talking about here are dangerous situations, absurd situations in prisons, and then acts that are basically disregarding that danger and putting officers in places where that danger is going to be visited upon them. So at bottom, does this get down to just a lack of funding by the legislature? Well, I don't think that's the case. I don't know that's the case. That's not been part of the motions. That — if that was the case, that would be on the defendants to claim that they — that some of the decisions were based on budgetary decisions, but we're not at that point yet. And I know from my other work that I don't think that is the case, but we don't know it in this case yet. Okay. Thank you. Thank you. Thank you for giving me a few minutes of rebuttal. I think Plaintiff's counsel just proved our point again that this case for them is really about failure to fixing locks, failure to staff, which are — which is inaction. It's not affirmative conduct. And what he just tried to do today is dissect each individual inmate classification, inmate movement, inmate placement. Every — every staff employee that was scheduled on any particular shift, he's trying to dissect it down and use those as affirmative acts, but it just doesn't work. This case has always been about the failure to do something, the failure to make the workplace safe, and that simply is not enough under any of this Court's precedent, and it's actually foreclosed by Collins. In addition to that, it all assumes that even if you have a malfunctioning cell door lock or inadequate staff on a particular shift, it assumes that any particular inmate is going to take advantage of that opportunity and assault whoever is the next CO. Let me ask you this, because I fear it's almost a metaphysical question that we're talking about. When is it an affirmative act, say, this open versus closed unit? Is it an affirmative act if you change it from a closed unit to an open unit? Now, isn't that an affirmative act rather than a failure act? If there was an order to, like, lock down a facility? Doesn't that have to be a change in order for there to be an affirmative act? If you just maintain an open system, that's a failure not to have a closed system, right? Right. But if you have a closed system and you make it an open system, then that's an affirmative act. That'd be an affirmative act, yeah. And you've got to look at, again, what — So it's just a matter of whether, in these circumstances where you're presented with that, the open versus closed, it depends on what the status quo is before that officer walks into the place. I believe that that is relevant. That's correct. If you look at their allegations, it's essentially just maintaining the status quo. It's maintaining the status quo. Thank you very much. Okay. Thank you, counsel. We thank both counsel. The matter is submitted at this time.
judges: Murphy, Paez, Rawlinson